RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

ESTATE OF SETH MICHAEL ZAKORA; BRANDY ZAKORA, in her capacity as the Personal Representative of the Estate of Seth Michael Zakora,

*Plaintiffs-Appellants*,

*v.*

TROY CHRISMAN; MATTHEW HUNTLEY; CHADWICK MOBLEY; STEVE JOHNSON; BONITA J. HOFFNER; STEVE RIVARD; HEIDI E. WASHINGTON; BRANDON OAKS; RUSSELL RURKA; HEATHER LASS; JAMES WOLODKIN; JAMES COLEMAN; UNKNOWN PARTY, named as Jane Doe,

*Defendants-Appellees*.

> No. 21-1620

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cv-01016—Janet T. Neff, District Judge.

Argued: April 27, 2022

Decided and Filed: August 10, 2022

Before: SUTTON, Chief Judge; GILMAN and MOORE, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Madeline M. Sinkovich, JOHNSON LAW, PLC, Detroit, Michigan, for Appellants. Kyla L. Barranco, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for the MSP Appellees. James T. Farrell, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for the MDOC Appellees. **ON BRIEF:** Madeline M. Sinkovich, Christopher Patrick Desmond, JOHNSON LAW, PLC, Detroit, Michigan, for Appellants. Kyla L. Barranco, OFFICE OF THE MICHIGAN ATTORNEY GENERAL,

Lansing, Michigan, for the MSP Appellees. James T. Farrell, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for the MDOC Appellees.

GILMAN, J., delivered the opinion of the court court in which MOORE, J., joined. SUTTON, C.J., (pp. 36–45), delivered a separate opinion concurring in part and dissenting in part.

RONALD LEE GILMAN, Circuit Judge. Seth Michael Zakora died from an overdose of fentanyl in his prison cell at the Lakeland Correctional Facility (Lakeland) in Michigan. His mother, Brandy Zakora, as the personal representative of his estate, brought this lawsuit against a number of employees and officials with the Michigan Department of Corrections (MDOC) and the Michigan State Police (MSP), asserting multiple claims under 42 U.S.C. § 1983.

The claims in essence allege that the defendants are responsible for Zakora's death because (1) they failed to protect him from the allegedly rampant problem of drug smuggling at Lakeland, and (2) they failed to promptly investigate two other incidents of drug overdoses in Zakora's small unit that occurred within two days of his own death. Zakora's estate (the Estate) also alleges that two corrections officers were deliberately indifferent to Zakora's serious medical needs by not heeding verbal warnings from other inmates about Zakora's dire health status immediately before he died.

The district court granted the defendants' motions to dismiss or, in the alternative, for summary judgment. For the reasons set forth below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** the case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual background

On the morning of January 22, 2017, Zakora was found lying unresponsive in his bunk in the C-Unit of Lakeland by defendant Steven Johnson, a corrections officer at the facility. Responding officers determined that Zakora was already dead due to the presence of rigor mortis, and the cause of death was later found to be accidental fentanyl toxicity. Earlier that morning, another prisoner allegedly told Johnson and/or defendant Chadwick Mobley (another corrections officer at Lakeland) to "check on Mr. Zakora because he was not doing well or

because there appeared to be something wrong with him." The complaint alleges that these warnings went unheeded, and that Zakora was never checked on, foreclosing the possibility of any lifesaving medical treatment.

Mobley worked the night shift in Zakora's housing unit from 10:00 p.m. on January 21 until 6:00 a.m. the next morning, at which time Johnson's shift started. Both Johnson and Mobley stated in unrebutted affidavits that they had no knowledge either before or during the night shift that Zakora possessed, ingested, or intended to ingest illegal drugs. Mobley stated that he did not speak with Zakora during that shift, and no one advised him to check on Zakora or to watch Zakora closely. According to Johnson's affidavit, he discovered Zakora dead in his bunk on January 22 at 7:58 a.m., only seconds after a prisoner who was exiting the unit said that Zakora was not "doing too good" or "words to that effect." Johnson also asserts that no one advised him that he should check on Zakora or watch him closely prior to that time.

The C-Unit of Lakeland is a single enclosure that houses between 12 to 16 prisoners. Two other prisoners in the C-Unit were hospitalized from drug overdoses in the two days prior to Zakora's death, but no immediate investigation was undertaken. After Zakora's death, the MSP brought a drug-detection dog into the facility. The dog's alerts gave positive indications of contraband in the C-Unit.

Zakora's overdose, according to the complaint, was the consequence of a longstanding problem of drug smuggling into Lakeland and other Michigan state prisons. At the time of Zakora's death, illegal drugs were allegedly being smuggled into Lakeland in basketballs that were thrown over the facility's fence. This scheme was allegedly orchestrated by defendant Jane Doe—an unidentified female corrections officer—and a prisoner with whom she was romantically involved.

According to the complaint, an unidentified prisoner had informed defendant Troy Chrisman, an inspector at Lakeland, about the drug-smuggling ring "on more than one occasion prior to Zakora's death, . . . provid[ing] information to the officers with details of how the drugs were coming in and who was providing them." Chrisman allegedly relayed this information to another inspector at Lakeland, defendant Matthew Huntley, but neither took any action nor

undertook any investigation. This information was then allegedly passed on by Chrisman and Huntley to their supervisors, defendant Bonita Hoffner (the Warden at Lakeland) and defendant Steve Rivard (the Assistant Deputy Director of the MDOC), but they allegedly either ignored the information or instructed Chrisman and Huntley to not investigate the accusations. Defendant Russell Rurka (the Administrative Assistant to the Warden of Lakeland) and defendant Heather Lass (a detective with the MSP) allegedly told Brandy Zakora that they knew about the scheme involving the drug-filled basketballs, but that they had not been able to catch the perpetrator. The prisoner who gave the information to the inspectors was subsequently charged with and convicted of smuggling drugs into Lakeland, allegedly to avoid any internal investigation into the female corrections officer who was involved in the smuggling.

As alleged in the complaint, drug smuggling by corrections officers is a chronic problem throughout the Michigan state prisons. The complaint recounts two incidents from 2016 when MDOC employees reported drug smuggling by corrections officers, but no investigation was undertaken. One of the employees allegedly sent his report to the MSP, and the other emailed his concerns directly to defendant Heidi Washington, the Director of the MDOC. Both of these employees were allegedly fired, only to be reinstated after instituting litigation and a civil-service hearing, respectively.

### B. Procedural history

The operative first amended complaint was filed in December 2019. Of the 13 defendants, 9 are current or former MDOC employees: MDOC Director Heidi Washington, Assistant Deputy Director Steve Rivard, former Lakeland Warden Bonita Hoffner, Lakeland Inspector Troy Chrisman, former Lakeland Inspector Matthew Huntley, former Administrative Assistant to the Warden Russell Rurka, Lakeland Corrections Officer Steven Johnson, Lakeland Corrections Officer Chadwick Mobley, and Lakeland Corrections Officer Jane Doe (who allegedly orchestrated the drug-smuggling scheme) (collectively, the MDOC Defendants). The remaining four defendants are MSP employees: Trooper Brandon Oaks, Trooper James Wolodkin, Lieutenant James Coleman, and Detective Heather Lass (collectively, the MSP Defendants).

Four claims were asserted in the first amended complaint. Count I alleged that all defendants except Johnson and Mobley failed to protect Zakora from illegal drugs that entered Lakeland, in violation of Zakora's Eighth Amendment rights. Similarly, Count II alleged that all defendants except Johnson and Mobley violated Zakora's Fourteenth Amendment rights under the state-created-danger doctrine by failing to investigate allegations of drug smuggling. Count III alleged that MDOC defendants Washington, Rivard, and Hoffner failed to train and supervise their subordinates with regard to preventing the smuggling of drugs into the prison, in violation of Zakora's Fourteenth Amendment rights. Finally, in Count IV, the Estate alleged an Eighth Amendment deliberate-indifference claim against MDOC Defendants Johnson and Mobley for failing to promptly check on Zakora after a prisoner allegedly told them that something was wrong with Zakora.

The MDOC Defendants and the MSP Defendants filed separate motions to dismiss or, alternatively, for summary judgment. These motions were accompanied by declarations and affidavits from some of the defendants that attested to their involvement in the events at issue as well as by other documents from the MSP investigation into Zakora's death.

After those motions were fully briefed, the Estate filed a motion for leave to file a second amended complaint, which sought to identify MDOC defendant Jane Doe as former Corrections Officer Tammy Blair. Its proposed second amended complaint also added two new MDOC defendants: current Corrections Officer Thomas Ivany and former Corrections Officer Chase White, both of whom, the Estate alleged, were engaged in smuggling drugs into Lakeland either jointly with or separately from Blair. The Estate asserted in its motion that, on April 30, 2021, the Estate's counsel had "received information from a person who was employed at the MDOC on the date of Seth's death" that included the names of the three aforementioned individuals who were allegedly involved in the drug smuggling at Lakeland.

In July 2021, the assigned magistrate judge issued a report recommending that both of the defendants' motions be granted. The report first concluded that the Estate had abandoned Count II (the state-created-danger claim), then analyzed the other claims against the MSP Defendants and the MDOC Defendants separately.

As for the MSP Defendants, the magistrate judge recommended dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the deliberate-indifference claim of Count I (the only count pursued against the MSP Defendants). The magistrate judge noted that the only relevant factual allegation made against the MSP Defendants was the statement from Lass to Brandy Zakora that the MSP knew that the drug-filled basketballs were being thrown over the fence, but that they were unable to catch the perpetrator. Because the MSP Defendants had each submitted unrebutted declarations demonstrating their lack of involvement in Zakora's death, the report concluded that they were also entitled to summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

The report rejected the Estate's argument that summary judgment was improper because the Estate had not yet been able to conduct discovery. Although the Estate's counsel submitted a declaration attesting that "[t]he information to be discovered includes documentary and testimonial evidence to support the allegations in the Complaint," the report concluded that counsel's declaration was too broad and did "not even minimally demonstrate[] that discovery would enable [it] to defeat summary judgment."

Moving to the MDOC Defendants, the report concluded that they too were entitled to dismissal under Rule 12(b)(6) on each of the claims asserted against them. The magistrate judge recommended that the failure-to-protect claim of Count I should be dismissed because the Estate did not plausibly allege that the MDOC Defendants were subjectively aware of the risk that Zakora specifically would ingest drugs. Count III's failure-to-train claim should likewise be dismissed, the report concluded, because government officials may not be held liable for the unconstitutional conduct of their subordinates unless the supervisors were directly involved in the wrongful conduct, and there was no allegation that the MDOC Defendants were aware of any specific risk to Zakora. Finally, the report concluded that the deliberate-indifference claim against Johnson and Mobley in Count IV should be dismissed because the complaint did not indicate the approximate time that Zakora died, or the approximate time that Johnson or Mobley were informed that Zakora might need help. This caused the magistrate judge to conclude that the complaint had shown only that Johnson and Mobley possibly, rather than plausibly, violated Zakora's Eighth Amendment rights.

The magistrate judge's report construed the MDOC Defendants' motion for summary judgment as limited to Johnson and Mobley because they were the only MDOC Defendants to submit affidavits.  Their respective unrebutted testimony established that they were each unaware that Zakora had ingested any drugs or was in distress for any other reason, which entitled them to summary judgment on Count IV.  Again, the report noted that the declaration submitted by the Estate's counsel in support of his request for discovery "lacks both details and specificity as to what discovery might yield," so the Estate had "failed to meet [its] burden under Rule 56(d)."

Finally, the report denied the motion for leave to file a second amended complaint.  The statute of limitations on the § 1983 claims had expired, and the report explained that the proposed second amended complaint did not "relate back" to the first amended complaint under Rule 15 of the Federal Rules of Civil Procedure.

Timely objections to the report were filed by the Estate, but the district court rejected those objections and, in September 2021, adopted the report in full.  Judgment was therefore entered in favor of the defendants, and this timely appeal followed.

## II.  ANALYSIS

The Estate does not contest the district court's conclusion that it has abandoned Count II of its complaint.  Our analysis is therefore limited to Counts I, III, and IV of the first amended complaint.

### A.  Standard of review

We review de novo the district court's dismissal of the Estate's lawsuit for failure to state a claim for relief.  *See Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011).  To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). We view the complaint in the light most favorable to the Estate as the nonmovant, accepting the complaint's well-pleaded factual allegations as true and drawing all reasonable inferences in favor of the Estate. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

"As a general rule, a court considering a motion to dismiss must focus only on the allegations in the pleadings." *Id.* (citation and internal quotation marks omitted). But if the court does consider matters outside the pleadings, then "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

We also review de novo the district court's grant of summary judgment. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 236 (6th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a summary judgment motion, we "must construe the facts in the light most favorable to the non-movant." *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). A party opposing a properly supported summary-judgment motion, however, "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).

We review a claim that summary judgment was prematurely entered because additional discovery was needed under the abuse-of-discretion standard. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002) (citing *Vance v. United States*, 90 F.3d 1145, 1149 (6th Cir. 1996)). The nonmovant, however, "bears the obligation to inform the district court of its need for discovery." *Id.* Finally, we review the denial of a motion for leave to amend the complaint under the abuse-of-discretion standard, "except when the denial was due to futility, in which case we review [the denial] de novo." *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

**B. Qualified immunity**

All of the defendants raised the defense of qualified immunity below. Notably, however, the MDOC Defendants do not pursue that argument on appeal. To overcome a defendant's qualified-immunity defense, a plaintiff must plausibly allege facts, and ultimately prove, "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (citation, internal alterations, and internal quotation marks omitted). Legal principles are "clearly established" when they "have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). This does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that [the rule] was firmly established." *Id.* (alteration in original) (citation and internal quotation marks omitted). But "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). "Thus, when 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, . . . there does not need to be a case directly on point." *Moderwell v. Cuyahoga County*, 997 F.3d 653, 660 (6th Cir. 2021) (quoting *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020)).

Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The Estate does not cite to any Supreme Court or Sixth Circuit precedent suggesting that an inmate has an Eighth Amendment right to be protected from the unfettered flow of drugs into a prison.  Two factors lead us away, however, from deciding this case under the "clearly established" prong of qualified immunity for the first time on appeal.

First, the MDOC Defendants have forfeited the argument as an appellate issue.  *See Watkins v. Healey*, 986 F.3d 648, 667 (6th Cir. 2021).  The MDOC Defendants did not make any argument at all as to the "clearly established" prong in their appellate brief, insisting only that the Estate did not plausibly allege a constitutional violation.  Indeed, the words "clearly established" do not appear a single time in that brief.  Our dissenting colleague, however, notes that a forfeiture argument can itself be forfeited, citing *United States v. Shultz*, 733 F.3d 616, 619 (6th Cir. 2013).  But unlike in criminal-sentencing cases, in which the basis for the district court's sentencing is necessarily clear from the sentencing record, the district court here did not address the "clearly established" or "obviousness" issues at all.  We cannot, however, undertake our own analysis without input from either party, when the "clearly established" prong depends on factual issues that were not before the district court, as discussed in more detail below.

Second, the resolution of the Estate's response to the defendant's qualified-immunity defense turns on facts that the parties have not yet developed.  The Estate argues that this is the rare, "obvious case where the unlawfulness of the officer's conduct is sufficiently clear." *Wesby*, 138 S. Ct. at 590 (citation and internal quotation marks omitted).  In the Estate's view, no reasonable official could have concluded that failing to investigate the drug smuggling at Lakeland, despite the documented risk of harm, was constitutional.  But the district court did not reach the "obviousness" issue because, once it decided that the Estate had not shown that a constitutional violation had occurred, there was no need for the court to address the second prong of the qualified-immunity defense.

For us to opine on this issue now would thus violate "the general rule that a federal appellate court does not consider an issue not passed upon below." *Haywood v. Hough*, 811

F. App'x 952, 962 (6th Cir. 2020) (quotation omitted); *see also Coble v. City of White House*, 634 F.3d 865, 871 (6th Cir. 2011) ("In light of its conclusion that Coble failed to show the violation of a constitutional right, the district court did not consider the second prong of the qualified immunity analysis. We leave consideration of whether the right was clearly established for determination by the district court in the first instance.").

We of course have discretion to deviate from the general rule in "exceptional cases" or to avoid "a plain miscarriage of justice." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988) (quoting *Hormel v. Helvering*, 312 U.S. 552, 557, 558 (1941)). For example, in some cases on appeal from a summary-judgment decision, we have exercised our discretion to examine on our own whether the law was clearly established. *See, e.g.*, *Gossman v. Allen*, 950 F.2d 338, 342 (6th Cir. 1991). That is a logical decision when the facts are fully developed below and the question at the heart of the qualified-immunity analysis is a "purely legal" one. *Id.*

But we see no similar reason to exercise our discretion here. To the contrary, any consideration of the "obviousness" argument at the motion-to-dismiss stage, where there has been virtually no factual development as to the MDOC Defendants' actions or inactions, would contravene the reasoning behind this court's stated preference for deciding a defendant's entitlement to qualified immunity at summary judgment as opposed to under Rule 12(b)(6). *See Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) ("The reasoning for our general preference is straightforward: 'Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious[.]'" (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring))).

Our dissenting colleague describes our refusal to address the "clearly established" prong as a "deus ex machina" (whatever that means), arguing that we are improperly saving the Estate's claim from defeat. Dissent at 41. But our decision is not based on some obscure technicality. The Estate makes serious allegations of misconduct within Lakeland. Consider, for example, the Estate's allegations that top prison officials instructed their subordinates not to investigate known drug smuggling at Lakeland and that other officials were themselves involved in supplying the lethal drugs to Zakora. Accepting these allegations as true, as we must at this

stage in the proceedings, the Estate has at least a colorable argument that "the unlawfulness of the [officials'] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *See Wesby*, 138 S. Ct. at 590 (citation omitted).

This issue, however, was not addressed by the district court nor adequately briefed on appeal, so consideration by us in the first instance would be inappropriate. *See Hart v. Hillsdale County*, 973 F.3d 627, 645 (6th Cir. 2020) ("Without the benefit of an initial determination by the district court or any developed argument on appeal, we are unable to decide in the first instance whether Hart received the process he was due or whether his right to that process was clearly established."). And because there has been no factual development regarding these disturbing allegations, this issue is best left to the district court to address in the first instance at the summary-judgment stage. *See Watkins*, 986 F.3d at 668 ("In sum, Healy has forfeited the issue of qualified immunity at this stage of the proceedings. Should Healy raise qualified immunity in a motion for summary judgment, . . . that would be the more appropriate time for this court to address that issue."); *see also Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) (en banc) ("Defendants may still assert the [qualified-immunity] defense in later proceedings on remand, even though they did not properly preserve it in the district court for purposes of this appeal.").

For these reasons, we review only the district court's conclusion that the Estate did not plausibly allege a constitutional violation. We do not consider nor express any view as to whether the alleged constitutional violation was obvious for the purposes of a qualified-immunity analysis.

## C.  The MSP Defendants

Although Count I was asserted against both the MSP Defendants and the MDOC Defendants, the allegations supporting the claim differ as to each group. We therefore follow the district court's lead in analyzing the sufficiency of the allegations separately as to the MSP Defendants and the MDOC Defendants.

Count I asserted that the MSP Defendants violated Zakora's Eighth Amendment rights by failing to protect Zakora from "the introduction, spread, and usage of dangerous drugs in prison."

The Eighth Amendment's prohibition of cruel and unusual punishments requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to] take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation and internal quotation marks omitted).

To establish an Eighth Amendment failure-to-protect claim, an inmate must show that prison officials acted with "deliberate indifference" to "a substantial risk of serious harm." *Id*. at 828 (citation omitted). A viable claim has both an objective and a subjective prong, requiring the plaintiff to demonstrate that "(1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (citing *Farmer*, 511 U.S. at 833).

As the district court observed, the complaint made very limited allegations against the MSP Defendants. The complaint alleged that the MSP Defendants "were involved with the drug smuggling ring and/or a cover up of Mr. Zakora's death," and that the MSP Defendants "knew that a 'cop/officer' was the person bringing suboxone and heroin into the facility but did not investigate the allegation in determining the source of the drugs that caused Mr. Zakora's death." In addition, the complaint alleged that the MSP Defendants "knew [of] and . . . participated in the drug smuggling and knew of the risks and harm associated with dangerous illegal drugs." The complaint also faulted the MSP Defendants for failing to bring a drug-detecting dog in to investigate the presence of contraband in the C-Unit before Zakora's death despite the two prior drug overdoses.

These allegations are insufficient to state an Eighth Amendment failure-to-protect claim against the MSP Defendants. The complaint failed to explain with any specificity how any of the MSP Defendants were involved in the drug-smuggling scheme or how each (or any) of them knew that a police officer was responsible for the operation. Nor did the Estate plausibly allege how any of the MSP Defendants came to obtain any knowledge about the prevalence of drugs at Lakeland, how they ignored that knowledge, or how they failed to curb the introduction, spread, and usage of drugs at Lakeland.

The allegation that MSP Detective Lass and MDOC Defendant Rurka told Brandy Zakora that drug-filled basketballs had been thrown over the fence before Zakora's death, but that "they couldn't catch the perpetrator," does not support the inference that Detective Lass or any other MSP Defendant was deliberately indifferent to the drug-smuggling problem. This allegation is ambiguous regarding who "they" are and does not specify when "they" knew and why "they" could not catch the perpetrator. If anything, it suggests that the MSP Defendants were actively trying to root out the drug-smuggling problem at Lakeland.

The allegation that the MSP Defendants did not bring in a drug-sniffing dog to Lakeland until after Zakora's death is also insufficient to state a claim. Responsibility for rooting out drug smuggling at Lakeland fell primarily to the MDOC, and we find nothing in the record to suggest that the MSP had any responsibility with regard to Lakeland unless the MSP was made aware of a reason to investigate.

As the district court determined, virtually all of the allegations against the MSP Defendants were "legal conclusions couched as facts." *See 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) ("[A] plaintiff cannot overcome a Rule 12(b)(6) motion to dismiss simply by referring to conclusory allegations in the complaint that the defendant violated the law."). The district court therefore properly dismissed Count I against the MSP Defendants. We consequently have no reason to consider whether summary judgment was properly granted to the MSP Defendants on this claim.

**D.  The MDOC Defendants**

The remainder of the claims were asserted against the MDOC Defendants. Because Johnson and Mobley were the only two MDOC Defendants who submitted affidavits, the district court construed the motion for summary judgment as limited to those two. Johnson and Mobley were named as defendants only in Count IV, so the court construed the MDOC Defendants' motion as to Counts I and III as a motion to dismiss. Although the MDOC Defendants as a group submitted more evidence than just Johnson's and Mobley's affidavits, the district court was not required to consider that evidence. *See Scheid v. Fanny Farmer Candy Shops*, 859 F.2d 434, 436 (6th Cir. 1988) ("When a motion to dismiss under Rule 12(b)(6) is accompanied by

matters outside the pleadings, as in this case, it is within the district court's discretion to consider such matters and decide the motion as one for summary judgment under Rule 56."). And because there is no indication that the court considered other evidence when deciding the motion to dismiss as to Counts I and III, it was not required to convert the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d) (stating that a "motion must be treated as one for summary judgment under Rule 56" only when "matters outside the pleadings are presented to and not excluded by the court").

### 1. The allegations state a failure-to-protect claim under the Eighth Amendment

Count I alleges that the MDOC Defendants failed to protect Zakora from the dangers of illegal drugs by failing to "do anything to curb the introduction, spread, and usage of dangerous drugs in prison, despite their direct knowledge from prisoners snitching to them and from two previous overdoses." For the reasons set forth below, the complaint's allegations establish both the objective and subjective prongs of a failure-to-protect claim.

### a. The objective prong

"To establish a constitutional violation based on failure to protect, a prison inmate first must show that the failure to protect from risk of harm is objectively 'sufficiently serious.'" *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The risk to inmate health or safety must be "excessive." *Farmer*, 511 U.S. at 837. This objective prong "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.*; *see also Farmer*, 511 U.S. at 834 (explaining that "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities'" (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981))).

Even where a serious injury occurs, the objective prong of a failure-to-protect claim requires an analysis of the risk to the injured party before the alleged injury occurred.

This analysis must consider the likelihood of harm to the injured party in the context of the circumstances that led to the injury. *See Reedy v. West*, 988 F.3d 907, 909, 912–14 (6th Cir. 2021) (concluding that, although the plaintiff had suffered a "brutal assault" at the hands of his cellmate, the objective prong was not met because general disagreements between the cellmates before the incident did not present a substantial risk of harm); *see also Schack v. City of Taylor*, 177 F. App'x 469, 472 (6th Cir. 2006) ("Schack in fact sustained a serious injury [after falling inside a detoxification cell], but this does not necessarily indicate a substantial risk of such an injury" because "[p]lacing an intoxicated man, even a highly intoxicated man, in a detoxification cell while awaiting booking does not violate contemporary standards of decency."). Zakora's death from a drug overdose in Lakeland does not, therefore, independently establish the objective prong.

The complaint plausibly alleges, however, that Zakora was at a substantial risk of that injury before it occurred due to the widespread presence of drugs at Lakeland, and in the C-Unit specifically. Fentanyl unquestionably poses a severe danger to anyone who comes in contact with it. There is also no question that "[t]he inherent danger of drugs is magnified when introduced to a controlled environment like a prison." *United States v. Colon*, 246 F. App'x 153, 156 (3d Cir. 2007).

According to the Bureau of Justice Statistics, incarcerated individuals are about 12 times more likely to exhibit drug dependence or misuse than the general population. Jennifer Bronson, et al., U.S. Dep't of Just., Bureau of Just. Stat., Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009, at 3–4 (2017), https://www.bjs.gov/content/pub/pdf/dudaspji0709.pdf (finding that about 58 percent of people in state prisons and about 63 percent of those sentenced to serve time in jails meet the definition for drug dependence or misuse, compared to 5 percent of the general population). Isolation and sheer boredom further complicate prisoners' efforts to resist drugs within prison walls. *See* Beth Schwartzapfel & Jimmy Jenkins, *Inside the Nation's Overdose Crisis in Prisons and Jails*, The Marshall Project (July 15, 2021), https://www.themarshallproject.org/2021/07/15/inside-the-nation-s-overdose-crisis-in-prisons-and-jails (quoting Leo Beletsky, Professor of L. & Health Scis., NE. U. Sch. of L.).

Overdose fatalities in prisons have indeed climbed dramatically in recent years.  From 2001 to 2018, the number of people who died of drug or alcohol intoxication in state prisons increased by more than 600%, according to an analysis from the Bureau of Justice Statistics. E. Ann Carson, U.S. Dep't of Just., Bureau of Just. Stat., Mortality in State and Federal Prisons, 2001-2018, at 6 (2021), https://bjs.ojp.gov/content/pub/pdf/msfp0118st.pdf.

Given these unique vulnerabilities, the risk of injury from unfettered access to deadly drugs inside a prison "is not one that today's society chooses to tolerate."  *See Helling*, 509 U.S. at 36.  And that is precisely what the Estate alleges here.  Drugs were allegedly so prevalent inside Zakora's C-Unit that two other inmates in his 12-to-16-person unit had overdosed in the two days prior to Zakora's death, yet the complaint asserts that no investigation was undertaken until after Zakora died.  Only after Zakora's death did MDOC officials order a full investigation and have the MSP bring a drug dog into the C-Unit to check for drugs.

Whether harm to a prisoner is from environmental factors such as second-hand smoke, *Helling*, 509 U.S. at 35, or from an assault by another inmate, *Bishop*, 636 F.3d at 766, the point is that prisoners may not be knowingly exposed to a sufficiently serious risk of harm.  Here, failing to investigate the presence of drugs after the first two overdoses in Zakora's C-Unit raises the inference that the risk to inmate health from those drugs was "sufficiently serious," such that Zakora was "incarcerated under conditions posing a substantial risk of serious harm."  *See Farmer*, 511 U.S. at 834 (citing *Helling*, 509 U.S. at 35).

The MDOC Defendants respond by arguing that an inmate who suffers an overdose from drugs that he voluntarily ingested cannot establish an Eighth Amendment claim because the "intentional and criminal decision to take the drugs" severs the causal connection between the defendants' actions and the inmate's death.  But this court's Eighth Amendment jurisprudence does not support such a broad rule.

An Eighth Amendment claim has been held viable against prison officials who are deliberately indifferent to dangers that are brought about by voluntary actions on the part of an inmate, most notably an inmate's risk of suicide.  *See, e.g.*, *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482–83 (6th Cir. 2020).  The objective prong is met in that context if the

plaintiff can plausibly establish "that the inmate showed suicidal tendencies during the period of detention." *Id.* at 483 (citations omitted). So, even though the voluntary action in taking one's own life does not bar the claim of a decedent's estate under the Eighth Amendment, courts must still assess the decedent's risk of taking that action before the suicide occurred.

Similarly, an inmate who suffers a drug overdose will not automatically lose a failure-to-protect claim simply because he voluntarily ingested the drugs. Such a claim is cognizable if the inmate alleges, and ultimately establishes, that he was at serious risk of injury from the presence of drugs before the injury occurred. Here, the Estate has met its burden by alleging the widespread presence of drugs that resulted in two prior overdoses in Zakora's small C-Unit in the days immediately preceding his own death.

The MDOC Defendants also argue that the objective prong cannot be met because "Zakora does not contend that the risk of exposure to drugs was greater inside [Lakeland] than outside of state custody." In their view, "to find that the MDOC Defendants violated Zakora's constitutional rights by failing to monitor him in prison would be to conclude that inmates are constitutionally entitled to greater protection from the effects of illicit drugs than non-incarcerated citizens." But this argument misunderstands the responsibility incumbent on the state when it takes an inmate into its custody.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) (citing *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982)). "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200 (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

This means that incarcerated persons are entitled to some protections that nonincarcerated persons do not receive. In the present case, the state of Michigan placed Zakora in custody and thereby restrained his liberty such that he did not have the freedom to distance himself from a

dangerous environment.   The state consequently assumed a responsibility to provide for his reasonable safety, which meant not allowing him unfettered access to deadly narcotics.

We emphasize that simple exposure to drugs, without more, does not violate contemporary standards of decency and thus does not satisfy the objective prong.   Prison officials are not required to show that they have prevented all drugs from entering their facility in order to be protected from liability.   Instead, we hold that unfettered access to drugs in a prison, as evidenced here by the officials' failure to promptly investigate the two prior overdoses in Zakora's C-Unit, is sufficiently serious to satisfy the objective prong of an Eighth Amendment claim.

### b. The subjective prong

We now turn to the subjective prong.   "Under this subjective deliberate-indifference standard, a prison official cannot be found liable under the Eighth Amendment 'unless the official knows of and disregards an excessive risk to inmate health or safety[.]'" *Rhodes v. Michigan*, 10 F.4th 665, 674–75 (6th Cir. 2021) (internal alterations omitted) (quoting *Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010)).   "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*.

Such awareness can be demonstrated through "inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (citations omitted).   Because each official's liability must be based solely on that official's own knowledge and actions, we consider the subjective prong for each defendant separately. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

The district court held that the subjective prong was not met because the complaint failed to show that any of the MDOC Defendants knew that Zakora specifically was at risk due to the influx of drugs.   But that reasoning is too narrow a construction of the subjective element.   The Supreme Court has made "clear that the correct inquiry is whether [the defendant] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether

he knew who the particular victim turned out to be." *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (internal alterations omitted) (citing *Farmer*, 511 U.S. at 843). Therefore, for the purposes of assessing an official's deliberate indifference, "it does not matter whether . . . a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

The two drug overdoses in the relatively small C-Unit of Lakeland that occurred in the two days prior to Zakora's fatal overdose presented a sufficiently obvious risk to infer that the MDOC Defendants who worked within Lakeland (i.e., Chrisman, Huntley, Hoffner, and Rurka) had knowledge of a substantial risk of harm to the other inmates in the C-Unit. Yet they failed to conduct a prompt investigation in an effort to rid the space of the drugs, thereby ignoring the risk of harm to the other prisoners within that space. The MDOC Defendants thus cannot escape liability by showing that they knew of a suspected risk of harm to inmates generally, but not to Zakora specifically. *See Moderwell v. Cuyahoga County*, 997 F.3d 653, 664–65 (6th Cir. 2021) (holding that the complaint adequately alleged that corrections officials were aware that their policies posed an excessive risk to all detainees, even though the complaint did not allege that the officials were aware of a risk to the particular detainee in question).

In addition, the complaint alleges that Inspector Chrisman knew of such a risk to Zakora in particular from the uncontrolled flood of drugs into Lakeland. Specifically, a prisoner allegedly told Inspector Chrisman "of the drug smuggling ring on more than one occasion prior to Mr. Zakora's death and provided information to the officers with details of how the drugs were coming in and who was providing them," giving "step by step details of how and when drugs were entering the facility and . . . about the individuals supplying large amounts of drugs to Mr. Zakora." Inspector Chrisman, in turn, allegedly relayed this information to his colleague, Inspector Huntley, and to his supervisors, Warden Hoffner and Assistant Deputy Director Rivard, all of whom likewise failed to act. The prisoner's detailed warning, considered in conjunction with the two prior overdoses, allows us to draw a "reasonable inference" that MDOC Defendants Chrisman, Huntley, Hoffner, Rivard, and Rurka knew of a substantial risk of harm to Zakora. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

But the same cannot be said for Director Washington. The complaint alleges generally that she "had notice that corrections officers were smuggling drugs into prisons." To support this allegation, however, the Estate offers only two alleged incidents from 2016 when MDOC employees at *other* Michigan correctional facilities reported drug smuggling by corrections officers, but where no investigations were undertaken. Director Washington was allegedly contacted directly by the whistleblower at one of these other facilities, but this does not support the inference that Director Washington was actually aware of any substantial risk of harm at Lakeland.

In sum, the allegations in the complaint are sufficient to establish the objective and subjective prongs of the failure-to-protect claim against MDOC Defendants Chrisman, Huntley, Hoffner, Rivard, and Rurka, but not against Director Washington. The district court therefore erred in dismissing the Count I claim against all of the MDOC Defendants.

Our dissenting colleague's contrary view is summed up in his opening paragraph with his clever-sounding but somewhat mocking critique that two wrongs (Zakora's prior criminal conduct and his voluntary drug overdose in prison) "apparently make a constitutional right." Dissent at 36. That is clearly *not* what we are saying. In the first place, Zakora's criminal conduct that landed him in prison is totally irrelevant to the issues before us. All inmates are in prison because they engaged in antisocial behavior, but surely that does not deprive them of all their constitutional rights once they are incarcerated. *Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974) ("[T]hough his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country.").

Secondly, we acknowledge that the Estate would have no claim if this were simply a run-of-the-mill drug-overdose case. It is not. Instead, the Estate claims that the relevant prison officials knew of Zakora's heavy drug use, knew that two of his immediate cellmates had been hospitalized in the 48 hours prior to Zakora's death due to drug overdoses, and yet they failed to initiate a timely investigation to remove the lethal substances from that cell that would have saved Zakora's life. Because the relevant defendants allegedly knew that Zakora was at risk and

ignored that risk, this is directly comparable to the suicide "deliberate-indifference" cases where this court has allowed the claim to proceed beyond the pleading stage. *See, e.g.*, *Moderwell*, 997 F.3d at 665 (holding that the administrator of a suicide victim's estate adequately stated a deliberate-indifference claim against prison officials by alleging that the officials knew about numerous detainee deaths by suicide at the facility in question and yet ignored those risks).

Our dissenting colleague responds by listing numerous hypothetical scenarios that purportedly expose the illogic of the Estate's claim. We find none of those examples on point, but the most egregious is his questioning whether, "[i]f a prisoner contracts a bloodborne disease from injecting heroin with an unsanitary needle, have officials imposed cruel and unusual conditions because they did not provide clean needles?" Dissent at 42. That is not remotely close to the situation alleged here.

The Estate is not contending that "cleaner" drugs should have been provided to Zakora. To the contrary, it is arguing that MDOC officials—equipped with the knowledge that drugs were flowing unimpeded into the facility, that Zakora was a heavy drug user, and that those drugs had just caused two overdoses in the C-Unit—should have taken immediate measures to investigate and remove those drugs from the cell. Requiring that prison officials respond to a serious drug problem of which they are aware hardly means requiring them to institute a needle-sharing program. But if prison officials are aware that a prisoner has access to dangerous substances, they are "not free to let the state of nature take its course" by standing by and allowing further harm to ensue. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

### 2. The allegations state a claim for supervisory liability against Hoffner and Rivard, but fail to state such a claim against Washington

We next turn to Count III, where the Estate alleged that defendants Washington, Hoffner, and Rivard failed to train and supervise Jane Doe and other prison employees to prevent the entry of illegal drugs into Lakeland and other MDOC facilities. It also alleged that these defendants failed to adequately supervise their subordinates by acquiescing in the subordinates' failure to take any remedial action to address the drug problem at Lakeland.

The complaint states that Washington, Hoffner, and Rivard are being sued in their "individual and supervisory capacity." In the Estate's response to these defendants' motion to dismiss, the Estate clarified that these individuals were also being sued in their official capacities. But the complaint seeks only money damages against these defendants, so these claims cannot be brought against them in their official capacities due to the Eleventh Amendment to the U.S. Constitution.

The Eleventh Amendment protects a state official from suit for monetary damages in his or her official capacity because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted); *see also Harper v. [Unknown] Arkesteyn*, No. 19-1928, 2020 WL 4877518, at *2 (6th Cir. Apr. 28, 2020) ("Harper's claims against the defendants in their official capacities are essentially claims against the governmental entity they represent, in this case the Michigan Department of Corrections. The defendants are therefore immune from suit for monetary damages in their official capacities."). Consequently, the Count III claim is cognizable against these defendants only in their individual capacities.

Turning to the adequacy of the complaint's allegations, individual liability on a failure-to-train or supervise theory "must be based on more than respondeat superior, or the right to control employees." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citation omitted). A simple failure to act, without "a showing of 'direct responsibility' for the actions of the individual officers," will not suffice to establish supervisory liability. *Hays v. Jefferson County*, 668 F.2d 869, 873-74 (6th Cir. 1982) (quoting *Rizzo v. Goode*, 423 U.S. 362, 376 (1976)). Instead, "supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir. 1999)).

As relevant here, a supervisor may be liable if he or she "abandons the specific duties of his [or her] position in the face of actual knowledge of a breakdown in the proper workings of the department." *Winkler v. Madison County*, 893 F.3d 877, 898 (6th Cir. 2018) (citation and internal alterations omitted). The supervisor must have abdicated his or her job responsibility,

and the "*active performance* of the [supervisor's] individual job function" must have directly resulted in the constitutional injury. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (emphasis in original). This means that, "at a minimum, the plaintiff must show that the defendant at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Peatross*, 818 F.3d at 242 (citation and internal quotation marks omitted). The subjective prong is the same as it is for the subordinate officers: "The supervisor need not have known of the substantial risk to the injured party but rather must have possessed knowledge of potential danger to a particular class of persons." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 488 (6th Cir. 2020) (citation omitted).

In dismissing this claim, the district court stated that "a supervisor's inaction will give rise to liability only where the plaintiff challenges 'ongoing conditions of confinement.'" The court held that the "claim here is not an ongoing conditions-of-confinement claim," but is instead "a failure-to-protect claim, for which they must show that Defendants were subjectively aware of a risk that Zakora would ingest the illegal drugs." Because the court held that the allegations were insufficient to show the defendants' knowledge of the risk to Zakora personally, it concluded that the claim failed.

But this characterization of the law is misguided. There is no functional difference between a conditions-of-confinement claim and a failure-to-protect claim, and the subjective requirement applies no matter how the claim is framed. *See Rhodes v. Michigan*, 10 F.4th 665, 673 (6th Cir. 2021) ("[A] plaintiff challenging the conditions of their confinement under the Eighth Amendment—whether based on inadequate medical care, a failure to protect the plaintiff from other inmates, or some other cognizable basis—must show that the prison officials acted with deliberate indifference to a substantial risk of serious harm." (citation and internal alterations and quotation marks omitted)).

The framing of the claim also has no bearing on whether a supervisor's inaction will give rise to liability; that is determined only by whether the supervisor had direct responsibility for the inaction such that the "*active performance* of the supervisor's individual job function directly result[ed] in the constitutional injury." *Winkler*, 893 F.3d at 899 (emphasis in original)

(alterations omitted); *see also Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 902 (1st Cir. 1988) ("Once an official is [] notified [of alleged constitutional violations by his subordinates], either actually or constructively, it is reasonable to infer that the *failure* to take [affirmative] steps [to correct the violations] . . . constitutes a choice 'from among various alternatives.'" (emphasis in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986))).

This case highlights the different circumstances under which inaction may and may not serve as the basis for supervisory liability. The Estate claims that the defendants exhibited deliberate indifference by either failing to order a prompt investigation into drug smuggling at Lakeland or by failing to promulgate additional or alternative policies aimed at preventing drug smuggling altogether. With regard to Director Washington, this claim fails. As explained above, the complaint does not adequately allege that Washington knew of the drug problem at Lakeland generally or of the two prior overdoses specifically, which is not surprising considering that the overdoses occurred just two days prior to Zakora's death. There is thus no basis to infer that Washington abdicated her job responsibilities in failing to order a prompt investigation or to take any other action at Lakeland.

The Estate is thus left with the assertion that Washington knew of a drug-smuggling problem throughout MDOC facilities. But to support this, the complaint alleges only that Director Washington was aware of two accusations of officer-involved smuggling at other MDOC facilities, which is insufficient to show a substantial risk of harm to all MDOC inmates. *See D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014) (recognizing that a county's knowledge of only three prior instances of constitutional violations by its prosecutors could not establish notice of habitually unconstitutional conduct in support of a failure-to-train claim). Even coupled with the complaint's allegation that "anti[-]overdose drugs have been used approximately 150 times" over the past two years, the allegations are insufficient because the figure is unaccompanied by any context that would allow us to infer that the problem was so severe that Washington "must have known" that *all* MDOC inmates were at a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 842–43 (1994). The complaint therefore does not adequately allege that Washington was deliberately indifferent by failing to promulgate additional or alternative policies in MDOC facilities.

Defendants Hoffner and Rivard, however, allegedly did have knowledge of the risk of harm at Lakeland and abdicated their job responsibilities in failing to take steps to abate that risk. The complaint alleges that Warden Hoffner and MDOC Assistant Deputy Director Rivard were told by Inspectors Chrisman and Huntley about the drug-smuggling problem at Lakeland, but Hoffner and Rivard allegedly either ignored the information or instructed Chrisman and Huntley not to investigate the accusations. In either scenario, a plausible claim is stated for failure to train or supervise their subordinates.

Hoffner and Rivard, as supervisors of the inspectors at MDOC, are directly responsible for giving orders to the inspectors. Failing to order an investigation into the drug smuggling, particularly after the two overdoses inside the C-Unit on consecutive days, could be found to constitute "knowing acquiescence" to the constitutional violation of exposing the inmates in the C-Unit to a substantial risk of serious harm. *See Howard v. Knox County*, 695 F. App'x 107, 115 (6th Cir. 2017) (holding that the plaintiff stated a claim for supervisory liability against a school principal by alleging that the principal "made no efforts to investigate, report, train, or terminate" a teacher who abused students, even after receiving complaints about the teacher); *see also Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 654 (1999) (concluding that a complaint alleging that a school board "made no effort whatsoever either to investigate or to put an end" to sexual harassment by a classmate "suggests that petitioner may be able to show . . . deliberate indifference on the part of the Board").

When supervisors responsible for inmate health and safety ignore known threats to those inmates, they are more than simply failing to act. In *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992), this court held that that a medical official could be held liable in his supervisory capacity for failing to respond to an inmate's medical needs because he personally ignored the inmate's complaint of not getting medication, and instead referred the complaint to the head nurse whom he knew was altering and destroying the inmate's prescriptions. The court rejected the medical official's argument that his mere "failure to act" was an insufficient basis to hold him liable for the violations of his employee because his actions in ignoring the inmate's complaint meant that he had "abandon[ed] the specific duties of his position." *Id*.

So too here.  The complaint adequately alleged that Hoffner and Rivard, in the face of a known threat to inmate safety "*personally* had a job to do" in ordering an investigation into the known presence of drugs at Lakeland (and inside the C-Unit specifically), "and [they] did not do it." *Id.* (emphasis in original).  This alleged failure could be found to have directly resulted in a violation of Zakora's Eighth Amendment right to be free from the substantial risk of harm.  The Estate has therefore stated a claim for failure to supervise against defendants Hoffner and Rivard.

### 3. The district court erred in holding that the allegations failed to state a claim against defendants Johnson and Mobley for deliberate indifference to Zakora's serious medical needs, but the court properly awarded summary judgment to the defendants on this claim

In Count IV, the Estate alleged that Defendants Johnson and Mobley were deliberately indifferent to Zakora's serious medical needs when they failed to check on him after a prisoner, at some point during the "night/early morning" of January 22, 2017, informed them that Zakora was "not doing well" or that "there appeared to be something wrong with him."  According to the complaint, Zakora could have received lifesaving medical treatment had Johnson and Mobley timely checked on him.

The district court first held that this claim should be dismissed under Rule 12(b)(6) because "[w]ithout some indication of the approximate time Zakora died and the approximate time the alleged prisoner spoke to Mobley or Johnson—to show saving him was still a possibility—there is no *plausible* claim that either Defendant violated Zakora's Eighth Amendment rights." (emphasis in original).  This was in error.

For the objective prong of a claim for deliberate indifference to a serious medical need, "the plaintiff must show that the medical need is 'sufficiently serious.'"  *Brawner v. Scott County*, 14 F.4th 585, 591 (6th Cir. 2021) (citing *Farmer*, 511 U.S. at 834).  There is no doubt that Zakora's overdose, which caused his death, satisfied the objective prong.

To satisfy the subjective prong, a complaint must allege facts showing that the defendant knew that the inmate faced "a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.  "An Eighth Amendment claimant, however, 'need not show that a prison official acted or failed to act

believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Farmer*, 511 U.S. at 842).

The complaint alleged that Johnson and/or Mobley were asked to "check on Mr. Zakora because he was not doing well or because there appeared to be something wrong with him" at a time when there had been two drug overdoses over the prior two days. Despite these warnings, the complaint alleges, neither Johnson nor Mobley investigated at all. This suffices to state a claim for deliberate indifference to a serious medical need. *See Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 363 (6th Cir. 2013) (reversing the dismissal of a complaint for deliberate indifference where the guards allegedly took thirty minutes to respond to cries for help from other inmates upon the breakout of a fight).

The complaint did not need to allege that Johnson and Mobley were aware of exactly what was ailing Zakora, just that they disregarded a known risk of substantial harm. *See Farmer*, 511 U.S. at 842–43; *see also Estate of Kowalski v. Shrader*, No. 21-cv-00827, 2022 WL 19422, at *11 (D. Colo. Jan. 3, 2022) (explaining that, to hold otherwise, "would be to incentivize prison officials to actively avoid responding to emergency calls or answering requests for help so as to ensure that they could later rely upon their own ignorance of any materialized medical harm to escape liability").

Despite this error, summary judgment was properly awarded to Johnson and Mobley on this claim because they submitted affidavits, which caused the district court to consider whether to award summary judgment under Rule 56. The affidavits established that neither Johnson nor Mobley were made aware at any time before Zakora's death that he had, or was planning to, ingest drugs. Moreover, Mobley attested that no one ever told him to check on Zakora, and Johnson checked on Zakora "only seconds" after another inmate first alerted him to a problem.

This evidence, which was unrebutted, established that neither Johnson nor Mobley were aware that Zakora was suffering from a serious medical condition before he died, and they acted appropriately once they were made so aware. *See Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003) (finding that "it can hardly be said that the Officers acted with deliberate indifference"

when "the Officers did not see, or otherwise have knowledge, that [the inmate] ingested cocaine" and, "[w]hen [the inmate] appeared to become ill, the Officers immediately summoned the paramedics"). Summary judgment was therefore properly granted to Johnson and Mobley on Count IV.

### E. The district court did not abuse its discretion in granting summary judgment before the Estate conducted discovery

The next issue is whether the district court erred in ruling on the defendants' motions for summary judgment without allowing any discovery to be conducted by the Estate. Rule 56(b) of the Federal Rules of Civil Procedure permits either party to file a motion for summary judgment "at any time until 30 days after the close of discovery." The Rule therefore "contemplates that a defending party may move for summary judgment even before any discovery has been taken." *Short v. Oaks Corr. Facility*, 129 F. App'x 278, 280 (6th Cir. 2005). Importantly, though, "[t]he general rule is that summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery." *Vance v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996) (citation omitted).

Rule 56(d) reconciles this situation by allowing the nonmovant to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," after which the court may "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." So, when a nonmovant believes that it needs more time for discovery before it can respond to a motion for summary judgment, "the non-movant must file an affidavit pursuant to Fed. R. Civ. 56[(d)] that details the discovery needed, or file a motion for additional discovery." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002). "Beyond the procedural requirement of filing an affidavit, Rule 56[(d)] has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) (citation omitted).

The Estate, seeking the opportunity to take discovery before responding to the defendants' motions for summary judgment, filed a Rule 56(d) affidavit. In its affidavit, the Estate posits that "[t]he information to be discovered includes documentary and testimonial evidence to support the allegations in the Complaint that, as demonstrated in Plaintiff's response brief, are also documented in other public sources and official documentation." This is plainly insufficient to be granted additional time for discovery. As this court has previously explained,

> [i]t is not an abuse of discretion for the district court to deny the discovery request when the party "makes only general and conclusory statements in its affidavit regarding the need for more discovery and does not show how an extension of time would have allowed information related to the truth or falsity of the document to be discovered." *Ironside v. Simi Valley Hosp.*, 188 F.3d 350, 354 (6th Cir. 1999). It is also not an abuse of discretion to reject a Rule 56[(d)] affidavit as insufficient to support further discovery when the affidavit lacks "any details" or "specificity." *Emmons v. McLaughlin*, 874 F.2d 351, 357 (6th Cir. 1989).

*Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004) (alterations omitted).

The affidavit submitted here did not attempt to describe with any specificity what discovery the Estate sought or how that discovery would support its claims. "Fairness does not blindly require a district court to grant a non-movant an opportunity for discovery where, as here, the non-movant does not in any detail describe what discovery she needs or what material facts she hopes to discover." *Short*, 129 F. App'x at 283. "It is not enough to state that discovery is needed without explaining *why* it is needed." *Id.* (emphasis in original). Because the Estate fell far short of meeting its burden of explaining the need for discovery, the district court did not err in ruling on the summary-judgment motion when it did.

### F. The district court properly denied the Estate's motion for leave to amend its complaint

This leaves, as the final issue before us, the propriety of denying the motion for leave to file a proposed second amended complaint. The Estate's proposed second amended complaint would identify MDOC Defendant Jane Doe as Corrections Officer Tammy Blair and add two new MDOC Defendants—Corrections Officer Thomas Ivany and former Corrections Officer Chase White—who were also allegedly engaged in smuggling drugs.

In denying the motion for leave to file an amended complaint, the district court read the magistrate judge's report as giving two reasons for denying the motion. The first reason was that the proposed second amended complaint was futile because it could not withstand a motion to dismiss, and the second reason was that the claims were time-barred and did not meet the requirements of Rule 15 of the Federal Rules of Civil Procedure. Because the district court agreed that the proposed amendment would be futile, it affirmed the magistrate judge's decision to deny the motion without addressing the second reason.

The district court's reliance on the first reason was erroneous. Beyond adding the new parties and identifying Jane Doe, the proposed second amended complaint essentially mirrors the first amended complaint. The amendment would thus not have been futile because it could "withstand a Rule 12(b)(6) motion to dismiss" for the reasons explained above. *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 421 (6th Cir. 2000).

We therefore must consider whether the proposed amendment "relates back" under Rule 15, which is necessary because the applicable statute of limitations for these claims has expired. *See Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005) (explaining that the statute of limitations for § 1983 claims brought in Michigan is the state's three-year statute of limitations for personal-injury claims). Rule 15(c)(1)(C) states that an amendment that changes a defendant but arises out of the same conduct as the original complaint "relates back" if the new defendant "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

The magistrate judge correctly ruled that the claims against Ivany and White cannot be saved by Rule 15 because Ivany and White are entirely new parties. This court has repeatedly held that "an amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations." *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010) (quoting *Leitch v. Lievense Ins. Agency, Inc. (In re Kent Holland Die Casting & Plating, Inc.)*, 928 F.2d 1448, 1449 (6th Cir. 1991)). Accordingly, the claims against Ivany and White are time-barred.

The amended claim that seeks to substitute Blair for Jane Doe, on the other hand, is viable so long as it meets the requirements of Rule 15(c)(1)(C). But the Estate has not shown that it would have named Blair "but for a mistake" concerning her identity.

Various district courts have commented that there is a "split in authority" in this court's jurisprudence as to whether an amendment naming a previously unknown Doe defendant can constitute a "mistake" under Rule 15(c)(1)(C). *See Reiner v. Canale*, 301 F. Supp. 3d 727, 736 (E.D. Mich. 2018) (collecting cases). This purported "split," which the magistrate judge explored below, is between two of our cases: *Berndt v. Tennessee*, 796 F.2d 879 (6th Cir. 1986), and *Cox v. Treadway*, 75 F.3d 230 (6th Cir. 1996).

In *Berndt*, this court upheld the district court's determination that the two named defendants in the action—a state mental-health institution and the state of Tennessee itself—were immune from suit on Eleventh Amendment grounds, but remanded the case to allow the plaintiff to amend his complaint by naming certain officials of the institution as defendants. 796 F.2d at 882–83. After acknowledging that any such amendments would likely be outside of the statute of limitations, the court set forth guidance for the district court's determination on whether an amendment would relate back under Rule 15(c). *Id*. at 883–84.

The court explained that constructive rather than actual notice to the new defendants would be sufficient to satisfy the notice prong of Rule 15(c), and that the new defendants' status as officials of the original defendants could itself be enough to impute notice to them. *Id*. at 884. As to the mistaken-identity prong, the court stated that it was "a patently factual inquiry [] left to the district court," and cautioned that "although the principles it announced [were] appropriate considerations for the district court, they [were] only guides." *Id*. The court thus did not actually analyze the mistaken-identity prong of Rule 15(c)(1)(C)(ii). But because it suggested that the amendment could "relate back" under these circumstances, several district courts have interpreted *Berndt* as "mak[ing] clear that naming Doe defendants after the expiration of the applicable limitations period could satisfy it." *Reiner*, 301 F. Supp. 3d at 735. The Estate, unsurprisingly, urges us to rely on *Berndt*.

In *Cox*, this court answered the question more directly. That case involved an excessive-force action in which the plaintiff had included four "unnamed police officers" among the defendants in his original complaint and subsequently named them after the statute of limitations had run. 75 F.3d at 239–40. The court concluded that replacing named parties for "John Does" does not satisfy the "mistaken identity" requirement because the newly named parties are considered new parties to the suit rather than a mere substitution of parties. *Id*. at 240.

Several reasons convince us to reaffirm the rule from *Cox* today. The first is that *Berndt* made clear that it was not deciding the Rule 15(c) question, 796 F.2d at 883–84, so the language from that case is necessarily dicta. Second, in the years since *Cox*, this court "has consistently cited *Cox* in unpublished cases . . . to hold that naming previously unnamed defendants does not satisfy the mistaken identity prong of Rule 15(c)(1)(C)(ii) because a lack of knowledge as to the identity of a defendant does not constitute a 'mistake' within the meaning of the Rule." *Reiner*, 301 F. Supp. 3d at 736 (collecting cases).

Finally, our decision on this issue comports with the definition of "mistake" under Rule 15. The Supreme Court has defined "mistake" as used in Rule 15 by its plain meaning: "[a]n error, misconception, or misunderstanding; an erroneous belief." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 548 (2010) (quoting Black's Law Dictionary 1092 (9th ed. 2009)). An absence of knowledge about whom to sue is not a misunderstanding and thus is not a mistake for the purposes of Rule 15.

Applying this rule here, the claim against Blair clearly does not "relate back" under Rule 15(c)(1)(C)(ii). The Estate goes to great lengths to convince us that Blair had constructive knowledge of the suit, but this argument fails to appreciate the difference between the notice requirement of Rule 15(c)(1)(C)(i) and the mistake requirement of Rule 15(c)(1)(C)(ii). Even if Blair had notice that the Estate might sue her, the amended complaint relates back only if Blair knew that it was due to a mistake that she was not sued. *See Metris-Shamoon v. City of Detroit*, 545 F. Supp. 3d 506, 516 (E.D. Mich. 2021) ("Although Plaintiffs may satisfy the notice requirement, . . . they cannot satisfy the 'but for a mistake' requirement." (citations omitted)).

The Estate makes no effort to identify any sort of error, misconception, or misunderstanding as to Blair's identity before the statute of limitations expired. Instead, it offers only that it could not have discovered Blair's identity before an MDOC employee telephoned the Estate's counsel to offer that information. This means that the Estate "did not make a mistake about which defendant to sue; [it] simply did not know whom to sue or opted not to find out within the limitations period." *Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012) (citing *Cox*, 75 F.3d at 240).

"Rule 15(c) offers no remedy for this problem. The Rule allows relation back for the mistaken identification of defendants, not for defendants to be named later through 'John Doe,' 'Unknown Defendants' or other missing appellations." *Id*. And although "this bright-line rule may bar some cases where a justification for the delay exists, equitable tolling should serve as an adequate safety valve for those plaintiffs with good excuses." *Brown v. Cuyahoga County*, 517 F. App'x 431, 435 (6th Cir. 2013). The Estate, however, has made no such argument here. For these reasons, the magistrate judge correctly concluded that the claims in the proposed amended complaint do not "relate back" under Rule 15 and are thus time-barred.

### III. CONCLUSION

We hold today that the Estate has adequately stated claims under the Eighth Amendment for failure to protect and failure to supervise that survive the MDOC Defendants' motion to dismiss as a matter of law. But we express no view as to the merits, where the Estate will bear the burden of proving the allegations in the complaint at the summary-judgment stage and at trial. Nor do we express any view as to whether the complaint states a violation of "clearly established" law, an issue that is best left for the district court to consider in the first instance.

In sum, we **AFFIRM** the judgment of the district court as to the dismissal of the complaint against the MSP Defendants and against MDOC Defendant Washington. We also **AFFIRM** the grant of summary judgment to MDOC Defendants Johnson and Mobley, and we agree with the district court's decision to deny the Estate's motion for leave to file a proposed second amended complaint. But we **REVERSE** the dismissal of Count I of the first amended complaint as to MDOC Defendants Chrisman, Huntley, Hoffner, Rivard, and Rurka, and the

dismissal of Count III against MDOC defendants Hoffner and Rivard.  We therefore **REMAND** the case to the district court for further proceedings consistent with this opinion regarding the remaining Count I and Count III claims.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SUTTON, Chief Judge, dissenting in part and concurring in part. Federal judges see all manner of conditions-of-confinement claims by inmates. But in nearly twenty years on the bench, I have never seen one like this. Here's the theory: Prison officials "inflicted" "cruel and unusual punishment[]" on Seth Zakora by failing to prevent him from voluntarily engaging in prohibited conduct—ingesting opioids—while serving his sentence for second degree criminal sexual conduct. Two wrongs—committing an initial felony outside of prison then consuming contraband in prison—apparently make a constitutional right. And clearly so at that. One can feel considerable remorse for what happened to Mr. Zakora and his family without altering the law. As Judge Neff correctly held, this sequence of events does not create a federal constitutional claim for money damages. Least of all does it create a clearly established right. The Court seeing it differently, I respectfully dissent.

A few facts orient the case. In January 2017, three prisoners in a unit at Lakeland Correctional Facility in Michigan suffered drug overdoses during the weekend. The first two prisoners overdosed on Friday and Saturday, and they survived. The third, Seth Zakora, overdosed on Saturday night and died from fentanyl toxicity on Sunday morning. The three inmates obtained access to the fentanyl, according to the complaint, when drug distributors tossed fentanyl-filled basketballs over the prison fence and yet-to-be-identified individuals recovered the drugs and apparently distributed them to inmates.

After her son's death, Brandy Zakora filed this lawsuit against four members of the Michigan State Police, two prison guards, and six administrators at the Department of Corrections. She also sued an unnamed corrections official.

Three counts remain. Each one invokes the Eighth (and Fourteenth) Amendment's guarantee that the States may not "inflict[]" "cruel and unusual punishments" on individuals. The first alleges that the prison administrators and state police breached a duty to protect Zakora's son from using dangerous illegal drugs. The second claims that the prison

administrators should be liable as supervisors for failing to protect her son. The third contends that two guards exhibited deliberate indifference to her son's serious medical needs after the overdose occurred.

The defendants moved to reject each claim as a matter of law under qualified immunity. The district court granted their motion.

The Court affirms some of its rulings, holding that Zakora failed to establish a plausible constitutional violation with respect to the serious medical needs claim as well as the failure-to-protect claims against the state police and the head of the corrections department. It also affirms the denial of her motion for leave to amend her complaint. I agree in each respect.

But the Court then permits the failure-to-protect claim against the prison guards and administrators to proceed as a cognizable constitutional violation at prong one of the qualified immunity inquiry. As to prong two of the qualified immunity inquiry, the Court simultaneously says that the defendants forfeited the argument *and* remands the issue for the district court to decide it in the first instance. I cannot agree.

If ever a claim was designed for qualified immunity, this is it. Zakora has not identified any court in the country, anytime anywhere, that has recognized such a claim. No hints, no dicta, no holdings. The point of the defense is to protect "all but the plainly incompetent" so "long as their actions could reasonably have been thought consistent with" the U.S. Constitution. *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987) (quotation omitted). A claimant thus may not obtain relief unless he shows (1) that state officials violated the U.S. Constitution and (2) that the right was clearly established at the time of the incident. Because the defense seeks to avoid exposing state officials to "the burdens of litigation," *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam), they may promptly appeal interlocutory decisions that reject it, *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014). In such appeals, we may resolve the defense in any sequence, whether by saying that the claimant failed to establish a threshold constitutional violation or the violation of a clearly established right. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In both settings, the imperative is to resolve the claims sooner rather than later.

Not today.  The Court takes three distinct paths instead, each off course in ways difficult to reconcile with these tenets.  The Court determines that the state officials forfeited prong two of the claim of qualified immunity in this appeal.  It decides that Zakora has raised a cognizable constitutional claim.   And it remands the case to the district court to decide the clearly established ruling in the first instance—even though it cannot identify a single case that has ever recognized such an unorthodox claim.  This winding approach defies convention.  While I am confident that the prison officials did not violate the U.S. Constitution, I am certain that their qualified immunity defense remains in the case and certain that they did not violate clearly established law.

*No forfeiture.*  The state officials raised qualified immunity at every relevant point.  In their first pleading before the district court, they asked the court to grant relief "based on qualified immunity."  R.37 at 11.  To overcome that immunity, they explained, Zakora bore the burden of proving that their conduct "violates clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id.* at 27–28 (quotation omitted).  They argued that Zakora failed to allege that they violated the Constitution.  And they argued that she could not show that their "actions were objectively unreasonable in light of clearly established law."  *Id.* at 28 (quotation omitted).  In support, they cited Supreme Court and Sixth Circuit qualified immunity cases, some holding that claimants failed to allege a constitutional violation, some holding that claimants failed to allege the violation of a clearly established right.  *Hunter v. Bryant*, 502 U.S. 224, 228–29 (1991) (per curiam); *Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996).  The prison officials reiterated the point in their reply, emphasizing that Zakora "does not cite binding precedent" supporting her claim and that "[w]ithout such clearly established law, [she] has failed to sustain her burden of showing the defendants are not entitled to qualified immunity."  R.45 at 4.  In their opposition to Zakora's motion to amend her complaint, they repeated, "Plaintiff's proposed amendment . . . does not change the theory of the case, which defendants have shown in their motions fails to establish that plaintiff's decedent's clearly established rights were violated."  R.49 at 5.

No surprise, given the oddities of this claim, the district court granted relief to the prison officials. The magistrate judge first recommended this outcome. Her analysis noted that the state defendants "raise[d] the issue of qualified immunity." R.53 at 6. The judge then observed that Zakora's case citations were "not directly applicable" before concluding that she failed to allege a constitutional violation. *Id.* at 14. The district court agreed with this recommendation. Judge Neff ruled that the officials won on prong one of the qualified immunity claim—that no constitutional violation occurred as a matter of law—holding that the "allegations about drug smuggling do not state any plausible constitutional violation." R.60 at 4. Because she found that no constitutional violation occurred, it follows, she did not think that state officials violated a clearly established right. A right cannot be "beyond debate" if it does not exist. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation omitted).

The qualified immunity defense—the key issue in the case—remained front and center on appeal. The losing party below, Zakora, appreciated that she had to clear this hurdle. In her opening appellate brief, she acknowledged that the prison officials had argued below that, even if a constitutional violation occurred, "they cannot be held liable because it is not clearly established." Appellant's Br. 45. Having confessed to the existence of the defense, Zakora tried to avoid its application by insisting that the officials were not entitled to qualified immunity because they violated the constitution and "[n]o reasonable state officials" could conclude otherwise. *Id.* In their brief, the state officials disagreed. In view of the dearth of caselaw in support of this novel claim, they stressed that the district court correctly found that no constitutional violation occurred, a prong-one argument that necessarily swept in failures at prong two. In support, the officials cited several cases holding that the claimants had failed to plead an Eighth Amendment violation on similar facts, whether at prong one or prong two of the qualified immunity defense. *See Shrader v. White*, 761 F.2d 975 (4th Cir. 1985); *Smith v. Connections CSP, Inc.*, No. 17-1733, 2018 WL 1433840 (D. Del. Mar. 20, 2018); *Alexander v. Padvaiskas*, No. 14-13675, 2015 WL 10433618 (D. Mass. Dec. 2, 2015); *Nunez v. Salamack*, No. 88 CIV. 4587, 1989 WL 74940 (S.D.N.Y. June 26, 1989). "One does not forfeit a qualified immunity defense by making arguments that, if accepted, establish the defense." *McNeal v. Kott*, 590 F. App'x 566, 569 (6th Cir. 2014).

Consistent with this briefing, the Court asked the lawyers about the qualified immunity defense at oral argument. We asked Zakora's lawyer, "What's your best case on the clearly established prong for this kind of voluntary conduct by inmates?" The lawyer cited *Rhodes v. Michigan*, 10 F.4th 665, 676 (6th Cir. 2021), in which a prisoner brought a failure-to-protect claim after she applied to work as a laundry porter and suffered severe injuries when a 400-pound cart fell on her. But what about "voluntarily engaging in illegal conduct," we followed up, "what's the case that establishes that?" The attorney admitted that Zakora did not "have a case that specifically establishes that." We asked her why that doesn't pose a "problem on the clearly established prong," noting it is "a pretty significant . . . doctrinal point." She did not mention another case. Oral Arg. 10:55–13:00.

When it came time for the lawyer for the corrections officials to take the podium, we asked whether it made sense to address the prong-one question: "Why not just make this easier and go to prong two of qualified immunity?" He said such an approach would be "exactly correct" and that he would "agree" with it. *Id.* at 16:10–20. When asked whether an inmate has a right to a safe prison environment, he conceded as much, but said that this definition was "too broad," and that for qualified immunity "you have to look at the constitutional right in the somewhat narrow context of the case." *Id.* at 20:00–20. He stressed that he has yet to see "any cases, one case" holding that a prisoner has a "constitutional right to a drug-free environment" or that officials must "protect[]" a prisoner "from himself" if he voluntarily takes drugs. *Id.* at 20:35–56.

On rebuttal, Zakora's lawyer identified more cases that purported to show that a violation occurred or that it was clearly established. Through it all, no lawyer and no judge raised the possibility that the qualified immunity defense had been forfeited—whether below, in the briefs on appeal, or at the appellate argument.

Even so, the Court saves the day by invoking forfeiture on its own. But a case is not a Greek play in which all-seeing judges, unbidden, come to the rescue by creating solutions that the parties do not seek. The qualified immunity defense does not go to our subject matter jurisdiction, giving us no license to raise forfeited issues in connection with it on our own. Making matters worse, the Court does not apply the rules of forfeiture evenly. A court sensitive

to forfeiture in one direction ought to be sensitive to it in the other.  A party may forfeit a forfeiture after all.  *United States v. Shultz*, 733 F.3d 616, 619 (6th Cir. 2013).  But Zakora never argued that the defendants forfeited anything.  Just as we must treat like individuals alike in our cases, we must treat like defenses alike.  To compromise the one invariably compromises the other.  This is not a forfeiture; it is a deus ex machina.

*No constitutional violation.*   On the merits of prong one of the qualified immunity defense, this conditions-of-confinement case strikes a few dissonant chords.  By its terms, the voluntary and illegal nature of Zakora's activity pushes the claim outside the Eighth Amendment's ambit.  The provision says that cruel and unusual punishments "shall not be . . . inflicted."  U.S. Const. amend. VIII.  How could corrections officials *inflict* this harm on Zakora when prison rules, state law, and federal law prohibit it—and Zakora violated those rules and laws?

Traditional conditions-of-confinement cases arise in a markedly different context from today's case.  When a State removes an inmate from society and restricts his freedom, it has obligations to him.  Having "stripped" inmates of "virtually every means of self-protection and foreclosed their access to outside aid," prison "officials are not free to let the state of nature take its course."  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  Incarceration prevents prisoners from obtaining their own food, so the prison must provide food.  They cannot go to the doctor, so the prison must provide medical care.  The State thus cannot lock someone up then deny him "essential food, medical care, or sanitation."  *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981).  Because life's basic necessities include physical safety, officials also cannot leave prisoners at the mercy of dangerous physical conditions, whether by incarcerating a person alongside an inmate hellbent on violence or exposing a prisoner to dangerous levels of secondhand cigarette smoke.  *Farmer*, 511 U.S. at 833–34; *Helling v. McKinney*, 509 U.S. 25, 31–32 (1993).

One feature of these decisions deserves special mention because it is uniformly present in the caselaw and conspicuously absent in this case.  The types of risks that give rise to Eighth Amendment claims are those an inmate cannot reasonably be expected to avoid on his own.  Consider the inmate who is jailed with a violent cellmate, *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011), locked up next to a chain smoker, *Helling*, 509 U.S. at 28, required to use

hazardous facilities, *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000), or subjected to dangerously low temperatures, *Spencer v. Bouchard*, 449 F.3d 721, 727–29 (6th Cir. 2006). In each circumstance, he has no way out.

But how could that be so here? Zakora never argues that her son consumed fentanyl involuntarily. What was true outside prison was true inside prison. Any risk from the availability of drugs did not become serious until he chose to use them.

Think about it this way. What if Zakora's claim concerned exposure to cigarette smoke? Sure, involuntary exposure to cigarette smoke in a prison violates the Eighth Amendment. *Helling*, 509 U.S. at 27–28. But how would we think about the claim if Zakora had been the one smoking—and had been smoking in violation of prison rules? And how would we think about the claim if Zakora had insisted on being jailed with a known violent cellmate (*Bishop*), or had insisted on using hazardous facilities (*Brown*), or had turned the temperature down himself in violation of prison rules (*Spencer*)?

Think about the Court's new rule in other settings. Does it really make sense to conclude that a prison official subjects an inmate to cruel and unusual conditions of confinement by failing to prevent him from voluntarily engaging in conduct, especially prohibited conduct? If a prisoner tries to escape by climbing a fence, have officials imposed cruel and unusual conditions if he falls and breaks his leg? If a prisoner contracts a bloodborne disease from injecting heroin with an unsanitary needle, have officials imposed cruel and unusual conditions because they did not provide clean needles? Asking is answering. The Eighth Amendment does not cover this claim.

*No clearly established constitutional right.* What ought to create a stop sign at step one of qualified immunity generates a grinding halt at step two. Recall that to overcome qualified immunity, Zakora must prove not only that the officials violated the Eighth Amendment but that they also violated clearly established Eighth Amendment law. That requires her to show that the law on the books at the time of this incident left the illegality of the officials' actions "beyond debate." *Wesby*, 138 S. Ct. at 589 (quotation omitted).

That is not remotely so. Start with what ought to be an end-of-the-story reality. No case holdings support the claim. None at all. That by itself should bring this dispute to a close.

There is more anyway. Consider the reality that drug abuse in prisons is not new. It has long plagued this country's prisons. *Overton v. Bazzetta*, 539 U.S. 126, 134 (2003). Yet Zakora has not identified a single decision holding that officials' failure to stem the flow of illegal drugs alone exposes them to liability for overdoses. The screeching silence of precedent seriously undermines this claim.

Even if we climb a few rungs up the level of generality of this claim, that does not improve the view. The claimant does not cite any circuit court case allowing a prisoner to sue for harm suffered as a result of his own misconduct. Is it really possible that two inmates living in the same cell could face such different circumstances? The one is caught with fentanyl and properly punished before he uses it. The other uses fentanyl and successfully sues the prison for injuries caused by its ingestion. No case creates such a ground-breaking rule.

Notable too is Zakora's inability to cite a case in this area about a prisoner's voluntary conduct. The rationale undergirding conditions-of-confinement claims—that inmates cannot escape dangerous conditions imposed by officials—disintegrates when the inmate himself takes on the risk of the illegal conduct. Zakora's mother responds by arguing that *Rhodes v. Michigan*, the laundry-porter case, clearly establishes the irrelevance of this distinction. In *Rhodes*, as she points out, we noted that Eighth Amendment "caselaw does not call for [an] inquiry into voluntariness." *Rhodes*, 10 F.4th at 676. But multiple points of distinction separate that case from this one. Start with the facts. Rhodes' decision to work as a laundry porter, and to stand in the wrong place at the wrong time when a guard allegedly hurled a heavy cart off a truck, cannot reasonably be compared to the decision to use illegal drugs. The voluntary act in *Rhodes* was attenuated from the harm that occurred. Not so here, where it was the most direct cause of the harm.

Move to the law. The language about voluntariness in *Rhodes* does not clearly establish anything for this case. The decision came more than four years *after* Zakora died. And the cited language evaporated as dicta when the Court explained that Rhodes did not volunteer for the

dangerous aspects of her job, *id.* at 676–77, precluding the case from establishing anything about voluntariness on prong one or two of the qualified immunity inquiry.

Zakora's remaining cases do no better. The suicide cases all have something Zakora conspicuously lacks: a warning that the inmate was a suicide risk. Suicidal tendencies qualify as a "serious medical need[]." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (quotation omitted). The Eighth Amendment covers them because an inmate, isolated from society, "must rely on prison authorities" for treatment. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). But no case applies this rationale to the voluntary consumption of *illegal* drugs banned within a prison. To use this caselaw here is to extend it, not to apply it. What of inmates suffering from addictions to alcohol or drugs when they enter prison and go through withdrawal? Here too the condition counts as a serious medical need. *Kindl v. City of Berkley*, 798 F.3d 391, 401 (6th Cir. 2015). But here too the cases are at least one step removed. No one claims that Mr. Zakora was suffering from withdrawal at the time of this incident.

Also unhelpful are cases to the effect that drugs are dangerous or that prison officials have an interest in keeping drugs out of prisons. *See, e.g.*, *Overton*, 539 U.S. 126; *Block v. Rutherford*, 468 U.S. 576 (1984); *Hudson v. Palmer*, 468 U.S. 517 (1984). They just concern the types of searches prison officials may conduct and the sorts of restrictions they may impose on visitors. That an interest suffices to support an action by corrections officials does not transform the failure to pursue that interest into an Eighth Amendment violation.

Nor does Zakora profit from three district court cases. Two of them arise from drug smuggling in prisons but neither one speaks to today's case. *Cooks v. Guterrez*, No. C-10-363, 2011 WL 832469, at *3 (S.D. Tex. Mar. 3, 2011) (holding that a prisoner stated an Eighth Amendment claim by alleging that he was threatened after he reported guard-condoned drug smuggling); *Mark v. Hickman*, No. H-17-2784, 2019 WL 5653631, at *6 (S.D. Tex. Oct. 29, 2019) (allowing an Eighth Amendment claim to proceed when an inmate alleged that a guard who smuggled drugs into the prison orchestrated a gang to beat him up). One of them deals with a prison's failure to treat an inmate promptly after he ingested illegal drugs. *Turner v. Cook Cnty. Sheriff's Off.*, No. 19 CV 5441, 2020 WL 1166186, at *5 (N.D. Ill. Mar. 11, 2020). The Eighth Amendment claim turned on treating a suffering inmate too slowly, not on preventing

him from voluntarily ingesting illegal drugs in the first place. Even if I ignored the reality that out-of-circuit district court cases cannot clearly establish a proposition for our purposes, *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020), they offer no help by their own lights.

Trying to overcome the problem of fitting square pegs into round holes, Zakora reaches for *Hope v. Pelzer*, 536 U.S. 730 (2002). That case like this one, she claims, is "the rare obvious case" so egregious that a plaintiff can prevail without the aid of precedent. *Moderwell v. Cuyahoga County*, 997 F.3d 653, 660 (6th Cir. 2021) (quotation omitted). But the facts of *Hope v. Pelzer* show why it does not apply. In 1995, Alabama allowed prison officials to handcuff prisoners to "hitching posts" to punish them for misbehavior in work squads, a practice unique in the country. *Hope*, 536 U.S. at 733–34. After Hope misbehaved at a worksite, guards left him hitched to the post for seven hours in the sun with no shirt. *Id.* at 734–35. The sun burned his skin, and guards honored his requests for water just twice and his requests to use the restroom not at all. *Id.* The court of appeals concluded that punishing Hope with the hitching post violated the Eighth Amendment but held that the absence of a case with "materially similar" facts prevented Hope from overcoming a qualified immunity defense. *Id.* at 736 (quotation omitted). The Supreme Court reversed, rejecting the notion that an official action is protected "unless the very action in question has previously been held unlawful." *Id.* at 739. The "obvious cruelty inherent in this practice," it reasoned, violated the Eighth Amendment. *Id.* at 741, 745.

*Hope* does not further Zakora's case. It covers situations at most about whether a factual situation satisfies a general legal threshold: Was an infliction of pain wanton? Was a use of force excessive? But that is not how Zakora uses the case. She invokes it to extend the Eighth Amendment to a new category of duties and risks. Hope's case and Zakora's case occupy different planes and different registers.

Because no forfeiture occurred, because no constitutional violation occurred, and because no clearly established violation occurred, the prison guards and administrators "should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau*, 543 U.S. at 198. I respectfully dissent from the Court's contrary decision.